# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**ROBERT SHREVE, et al.,**

**Plaintiffs,**

v.

**FRANKLIN COUNTY, OHIO**
**et al.,**

**Defendants.**

Case No. 2:10-cv-644

**JUDGE SARGUS**

**MAGISTRATE JUDGE ABEL**

## OPINION AND ORDER

Presently before the Court are interested party the United States of America's Motion to Intervene (Doc. 45), Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 66), Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (Doc. 4), and the National Fraternal Order of Police's Motion to File an Amicus Brief on Behalf of Defendants (Doc. 62). For the reasons set forth herein, the Court hereby **GRANTS** these motions. Also before the Court is Plaintiffs' Motion to Compel Inspection (Doc. 14). Because the Parties have represented that this motion is moot, it is hereby **DISMISSED**.

## I. Background

Plaintiffs Robert Shreve, Michael Worley, Michael Reed, and Dawn Fiore-Bruno bring the instant class action lawsuit against Franklin County, Ohio, Sheriff Jim Karnes, and various sheriff deputies, alleging a pervasive practice wherein prisoners at the Franklin County Corrections Centers are subjected to excessive force through the use of stun guns manufactured by TASER International, Inc. (commonly known as and referred to hereinafter as "tasers"). The Franklin County Sheriff's Office ("Sheriff's Office") operates the two Franklin County Corrections Centers ("FCCCs"). Plaintiffs Shreve, Reed, and Fiore-Bruno were all formally

incarcerated in one of the FCCCs and have since been released. (Am. Compl. ¶¶ 11, 15, & 17.) Plaintiff Worley remained incarcerated at the time Plaintiffs filed their amended complaint on August 27, 2010 (Am. Compl. ¶ 13), but Plaintiffs have indicated that he has since been released. (*See* Doc. 23 at 9.)

Each of the four named Plaintiffs alleges that he or she was subjected to excessive force while incarcerated at the FCCCs through the use of tasers by sheriff's deputies. (*See* Am. Compl. ¶¶ 75–237.) Each brings individual claims for money damages pursuant to 42 U.S.C. § 1983 for violations of their Fourth, Eighth, and/or Fourteenth Amendment rights. (*See* Am. Compl. ¶¶ 75–237.) Additionally, Plaintiffs Shreve and Worley also bring claims for injunctive and declaratory relief on behalf of themselves and a prospective class consisting of "[a]ll persons who, now or at any future time during the pendency of this litigation, are or will be placed in the custody of the Franklin County Sheriff's Department at the Franklin County Corrections Centers." (Am. Compl. ¶240.) By Order dated July 20, 2010, the Court granted Plaintiffs permission to move immediately for class certification and appointment of class counsel. (*See* Doc. 3.)

On November 2, 2010, the United States of America, acting through the Department of Justice, Civil Rights Division ("Department of Justice"), filed a statement of interest in this action (Doc. 42). The next day, following a telephone status conference involving all parties, the Department of Justice formally filed a motion to intervene pursuant to Federal Rule of Civil Procedure 24 (Doc. 45), claiming an interest in this action arising from the Attorney General's authority under 42 U.S.C. § 14141(b). Additionally, the National Fraternal Order of Police ("NFOP") has sought permission to file an amicus brief in this matter (Doc. 62). Finally, on

December 10, 2010, Plaintiffs moved for leave to amend their complaint for the second time (Doc. 66). The Court now considers each of these motions in turn.[1]

## II. Motion of the NFOP to File an Amicus Brief

As the motion of the NFOP for leave to file an amicus brief (Doc. 62) is unopposed, it is hereby granted.

## III. Plaintiffs' Motion for Leave to File Second Amended Complaint

Plaintiffs have requested leave to file a second amended complaint that provides the names of Defendants heretofore referred to as John and Jane Does. As this motion (Doc. 66) is unopposed, it is hereby granted.

## IV. The Department of Justice's Motion to Intervene

The Department of Justice seeks to intervene as a matter of right pursuant to Rule 24(a), and in the alternative, seeks permission to intervene under Rule 24(b). The Court finds that the Department of Justice has timely established its right to intervene. Additionally, permissive intervention under Rule 24(b) would be appropriate in this case.

### A. Rule 24(a) Intervention

Rule 24(a) provides that:

On timely motion, the court must permit anyone to intervene who:

. . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a). The Sixth Circuit has extrapolated the following four elements from Rule 24(a) that must be satisfied to establish a right to intervene:

---

[1] The Fraternal Order of Police, Capital City Lodge No. 9 has moved to intervene as a party (Doc. 59). This Opinion and Order does not address the motion as the matter is disputed and not fully briefed.

(1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect their interest may be impaired in the absence of intervention; and (4) the parties already before the court cannot adequately protect the proposed intervenor's interest.

*Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007). The

Department of Justice has met each of these factors.

## 1. Timeliness

"The determination of whether a motion to intervene is timely should be evaluated in the

context of all relevant circumstances." *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir.

1990). Factors that should be considered in evaluating timelines include (1) the progression of

the suit; (2) the purpose for intervention; (3) the amount of time before attempted intervention

during which the intervening party was aware of its potential interest in the case; (4) prejudice to

the original parties that could arise as a result of the intervenor's failure to intervene upon

discovering its interest in the case; and (5) any unusual circumstances weighing for or against

intervention. *Id.*

In the instant case, a balancing of these factors indicates that the Department of Justice's

motion to intervene is timely. Prior to the Department of Justice's motion to intervene, the Court

had not ruled on the pending motion for class certification and the parties were engaged in

limited discovery in preparation for a hearing on Plaintiffs' motion for a preliminary injunction

(Doc. 6). Significantly, at the time of its proposed intervention, the Department of Justice

indicated that it was prepared to participate at the then-scheduled preliminary injunction hearing,

which was initially scheduled for November 8th. (*See* Doc. 42 at 3.)

The Department of Justice's purpose in intervening is the enforcement of 42 U.S.C. §

14141, which makes it unlawful "for any governmental authority, or any agent thereof, or any

person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers" that deprive individuals of their constitutional rights.  42 U.S.C. § 14141(a).  The Department of Justice also purports to intervene for purposes of judicial economy, as its claims essentially overlap with Plaintiffs' claims, and will rely on identical discovery.  "The 'purposes of intervention' prong of the timeliness element normally examines *only* whether the lack of an earlier motion to intervene should be excused, given the proposed intervenor's purpose . . . ."  *Stupak-Thrall v. Glickman*, 226 F.3d 467, 479 n.15 (6th Cir. 2000) (emphasis in original).  Accordingly, the Court will consider the second prong in relation to the third prong of the timeliness analysis.

The Department of Justice represents that it became aware of this action in July 2010, and indicated its intent to intervene approximately three and one half months later and less than one week before the scheduled preliminary injunction hearing—a hearing that had been set in early August.  (*See* Doc. 10.)  During that time, the Department of Justice represents that it was reviewing the case before making the determination as to whether to intervene.  While attempted entry into the case on the eve of a preliminary injunction hearing that had been on the calendar for three months weighs against the timeliness of the Department of Justice's motion, the Department of Justice's purpose for intervening outweighs the delay, particularly given that it did not seek a delay of the hearing date (the Defendants properly sought additional time to depose the Department of Justice's witnesses and add an additional expert).  The Attorney General is given the authority to enforce § 14141(a), a statute enacted to protect constitutional rights.  Additionally, because the Department of Justice's claims overlap with those of Plaintiffs and similar relief is sought, judicial economy and efficiency are furthered by allowing the Department of Justice to intervene as opposed to filing a separate action against Defendants.

Turning now to the fourth factor, the Court finds that none of the parties would be prejudiced by allowing the Department of Justice to intervene at this point in the litigation. The Department of Justice's prospective involvement in this case has lead to an expansion of the discovery process, through the designation of additional expert witnesses. However, this has not been prejudicial to Defendants because they have also been afforded the opportunity to secure additional experts of their own, and to depose the Department of Justice's experts. The expanded discovery process has proceeded in a relatively orderly and timely manner. Similarly, as noted, the Department of Justice does not bring any claims in addition to those brought by Plaintiffs and seeks similar injunctive relief.

While the Court does not identify any unusual factors present in this case per the fifth prong, a balancing of the other four prongs indicates that the Department of Justice's motion to intervene is timely. The litigation had not progressed to an advanced stage at the time of the Department of Justice's motion. While the motion was filed several months after the Department of Justice became aware of this suit, the Department of Justice has articulated legitimate and important purposes for intervening that outweigh the effects of the delay. Finally, the other parties will not be prejudiced by the Department of Justice's intervention.

### 2. Legal Interest

The second element necessary for an intervention of right under Rule 24(a) requires that "the proposed intervenor has a substantial legal interest in the subject matter of the case." *Coal. to Defend Affirmative Action*, 501 F.3d at 779. The Department of Justice's asserted interest in this case easily meets this element. Plaintiffs have filed suit seeking an injunction to end what they term "a pervasive practice of subjecting arrestees and inmates at the [FCCCs] to the excessive and disproportionate use of force." (Am. Compl. ¶ 2.) The Attorney General is tasked

with enforcing § 14141, which itself makes it unlawful for government entities to engage in a pattern or practice of depriving persons of their constitutional rights. Thus, the Attorney General and the Department of Justice have a clear and substantial interest in the present litigation.

### 3. Impairment of the Department of Justice's Interest

The third element that must be established by the Department of Justice is that its ability to protect its interest may be impaired in the absence of intervention. *Coal. to Defend Affirmative Action*, 501 F.3d at 779. Here, given the Attorney General's authority to assert claims for injunctive relief of the same nature as those asserted by Plaintiffs, and that the Department of Justice's claims arise from facts identical to those of Plaintiffs' claims, the third element is met because the Department of Justice's interest could be impaired by an adverse ruling. *See Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1007–08 (6th Cir. 2006) (citing *Linton v. Comm'r of Heath and Env't*, 973 F.2d 1311, 1319 (6th Cir. 1992), for the proposition that "potential *stare decisis* effects can be a sufficient basis for finding an impairment of interest").

### 4. Representation of the Department of Justice's Interest

The final element required to establish an intervention as of right is that "the parties already before the court cannot adequately protect the proposed intervenor's interest." *Coal. to Defend Affirmative Action*, 501 F.3d at 779. "[T]he proposed intervenor['s] burden in showing inadequacy is minimal." *Grutter v. Bollinger*, 188 F.3d 394, 400 (6th Cir. 1999) (internal quotation omitted). In this regard, the proposed intervenor must only demonstrate that the representation of its interests by the existing parties may be inadequate. *Linton*, 973 F.2d at 1319. However, when the proposed intervenor and a party to the suit share the same ultimate

objective, a presumption arises that the representation will be adequate. *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987).

Here, the ultimate objectives of the Department of Justice and Plaintiffs are similar, but not identical. Both seek injunctive relief to end the allegedly unconstitutional practices. Plaintiffs, however, also seek money damages. *Infra*, the Court finds that Plaintiffs have standing to seek injunctive relief and grants their motion for class certification. While the Plaintiffs' pursuit of injunctive relief on behalf of all the inmates of the FCCCs aligns with the Department of Justice's objectives, the possibility exists that those interests could diverge. For instance, the class has been certified on a provisional basis. If at some point in the future of this litigation the class were decertified, Plaintiffs could find themselves in a position where settling their individual claims for monetary damages would become a priority over obtaining prospective relief. Additionally, the Court has ruled that the individual Plaintiffs have standing to pursue claims for prospective relief, but that determination is based on the allegations contained in the amended complaint and the limited record currently before the Court. As the litigation progresses, the burden will remain on Plaintiffs to demonstrate their continued standing and the possibility remains that they will be unable to do so.

Finally, Plaintiffs and the Department of Justice may have differing views on the exact form that any prospective relief may take. In this regard, the named Plaintiffs are individuals who have actually been incarcerated at the FCCCs and tasered. Their views on what may or may not be appropriate in terms of relief may differ substantially from the perspective of the Department of Justice. For these reasons, the Court finds that the Department of Justice has met its minimal burden of demonstrating that the parties currently before the Court will inadequately represent its interests in this case. Accordingly, the Department of Justice has established that it

8

is entitled to intervene as a matter of right, and the Court grants its motion to intervene on that basis.

## B. Rule 24(b) Intervention

In the alternative, the Court also finds that permissive intervention pursuant to rule 24(b) is appropriate in this case. Rule 24(b) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact. FED. R. CIV. P. 24(b)(1). In considering whether permissive intervention should be allowed, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(3).

A review of the Court's analysis in Part IV.A, *supra*, supports the conclusion that permissive intervention should be afforded the Department of Justice under Rule 24(b). As indicated in Part IV.A.1, a balancing of the five factors enumerated in *Jansen*, indicates that the Department of Justice has timely moved to enter this action. Further, the Department of Justice's claims share nearly identical questions of law and fact as those of Plaintiffs. Finally, the Department of Justice's intervention in the case will not unduly delay or prejudice the adjudication of the rights of either Defendants or Plaintiffs.

## V. Motion for Class Certification and Appointment of Class Counsel

The Court now turns to Plaintiffs' motion to certify class and appoint class counsel, first considering whether Shreve and Worley have standing to seek prospective relief on behalf of themselves and the proposed class.

## A. Standing

Standing to bring suit is a prerequisite that must be established before the prospective claims of Shreve and Worley can proceed. Absent standing to challenge the alleged

unconstitutional practices of Defendants on their own behalf, they are precluded from asserting

the same claims on behalf of the proposed class. *See Holmes v. Pension Plan of Bethlehem Steel*

*Corp.*, 213 F.3d 124, 135 (3rd Cir. 2000). On November 1, 2010, the Court held oral argument

on the question of standing to provide the Parties an opportunity to clarify their positions on this

key threshold issue. The argument focused on the Supreme Court's decision in *City of Los*

*Angeles v. Lyons*, 461 U.S. 95 (1983).

Article III, § 2 of the Constitution limits the jurisdiction of the federal courts to actual

cases or controversies. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997). Standing to sue is an

element of the case and controversy requirement. *Id.* Defendants have asserted that because

Shreve and Worley have both been released from the FCCCs, they lack standing to bring claims

on behalf of themselves and the proposed class. The Sixth Circuit has held, however, that

standing is to be determined at the time a lawsuit is filed. *Cleveland Branch, NAACP v. City of*

*Parma*, 263 F.3d 513, 524 (6th Cir. 2001). Accordingly, as both Shreve and Worley were

incarcerated at the time the complaint was filed in this case, they do not lack standing by virtue

of the fact that they have subsequently been released. Nonetheless, the Court's inquiry into

standing does not end with this conclusion.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court summarized

three elements comprising the "irreducible constitutional minimum of standing." *Id.* at 560. The

Court stated:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not "conjectural" or "hypothetical[.]" Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to
> be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e]
> result [of] the independent action of some third party not before the court." Third,
> it must be "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Id.* at 560–61 (internal quotations, citations, and footnotes omitted). Here, Shreve and Worley essentially allege that a practice or custom exists at the FCCCs whereby prisoners are routinely subjected to unconstitutional levels of force through the use of tasers. Assuming that a cognizable injury exists in this case, the second and third factors are easily met. The conduct complained of is traceable to Defendants who operate the FCCCs and establish the policies and practices governing treatment of the inmates. Additionally, an injunction from this Court requiring Defendants to bring the allegedly illegal practices within the bounds of the Constitution would redress the injury.

As to the claims for prospective relief, whether the Plaintiffs may suffer a future injury presents a much more difficult question. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects. . . . Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) (holding that plaintiffs lacked standing to seek injunction against allegedly unconstitutional acts of a county judge and magistrate judge where none of the plaintiffs claimed to actually be involved in a case presently before either judge).

*Lyons* is illustrative of the standing problems faced by litigants alleging possible injury by future illegal conduct. There, the plaintiff filed suit against the City of Los Angeles seeking damages for injuries sustained when police officers used an allegedly illegal chokehold on him and seeking injunctive relief barring the police from using chokehold techniques in the future. *Lyons*, 461 U.S. at 98–99. At issue in the case was whether the plaintiff had standing to seek the equitable relief. The Court, relying on its earlier decisions in *O'Shea* and *Rizzo v. Goode*, 423 U.S. 362, 372 (1976) (holding that plaintiffs lacked standing to seek injunctive relief against

11

allegedly unconstitutional police practices where allegations of future injury were "even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant invocation of federal jurisdiction"), ruled that the plaintiff lacked standing to seek an injunction. The Court stated:

> No extension of *O'Shea* and *Rizzo* is necessary to hold that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought. Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

*Lyons*, 461 U.S. at 105 (footnote omitted). According to the Court, Lyon's lacked standing because of "the speculative nature of his claim that he [would] again experience injury as the result of" the allegedly unconstitutional police practices. *Id.* at 109. To establish standing:

> Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner. Although Count V alleged that the City authorized the use of the control holds in situations where deadly force was not threatened, it did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy. If, for example, chokeholds were authorized to be used only to counter resistance to an arrest by a suspect, or to thwart an effort to escape, any future threat to Lyons from the City's policy or from the conduct of police officers would be no more real than the possibility that he would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation.

*Id.* at 105–06. Finally, the Court held that standing to bring a claim for damages resulting from past illegal conduct did not necessarily establish standing to seek injunctive relief. *See id.* at 111.

The party invoking the jurisdiction of the federal courts has the burden of establishing each of the elements of standing. *Lujan*, 504 U.S. at 561. As the Supreme Court stated in *Lujan*:

> [s]ince they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.

*Id.* (emphasis in original). "'[S]tanding cannot be inferred [] from averments in the pleadings, but rather must affirmatively appear in the record.'" *White v. United States*, 601 F.3d 545, 551–52 (6th Cir. 2010) (quoting *Spencer v. Kemna*, 523 U.S. 1, 10–11 (1998)). Accordingly, this Court will look to the pleadings and record presently before it to determine if Shreve and Worley have sufficiently alleged or demonstrated an imminent injury in fact. In so doing, the Court concludes that Shreve and Worley have made sufficient allegations, albeit by a slim margin, to confer standing at least at this early stage of the litigation.

Plaintiffs' amended complaint alleges that "[i]t is the custom, policy and standard operating practice of Franklin County Sheriff's corrections deputies to repeatedly use their tasers in a callous and sadistic manner . . . that violates the Constitutional rights of arrestees and inmates at the Franklin County Corrections Centers." (Am. Compl. ¶ 8.) The Amended Complaint also alleges specific examples purporting to illustrate the frequent unconstitutional use of tasers at the FCCCs. According to the Amended Complaint, in "case after case" tasers are used against inmates that are outnumbered by deputies. (Am. Compl. ¶ 51.) In other cases, tasers are used against inmates in mechanical restraints. (Am. Compl. ¶ 52.) The Amended Complaint further alleges that "[d]eputies also use the taser as a retaliatory weapon when detainees show verbal resistance or question authority by using profanity or making derogatory

13

remarks to staff." (Am. Compl. ¶ 54.) Finally, the Amended Complaint alleges that nearly every use of the taser against inmates was found to be "justified" by Sheriff's Office officials upon review, (Am. Compl. ¶ 72), and that Shreve and Worley "along with all proposed class members, are at risk of having their constitutional rights violated through FCCC deputies' use of tasers." (Am. Compl. ¶ 243(a).)

In addition, the record contains videos depicting several taser incidents, including those of Shreve and Worley. Shreve is tasered while being held down by four deputies with his hands cuffed behind his back. Several other deputies are standing nearby. While sound from the video indicates that Shreve may have been attempting to bite one of the deputies, Plaintiffs are alleging that use of the taser against Shreve in those circumstances, i.e. while physically immobilized, was unnecessary and excessive. Worley is tasered for apparently raising his voice toward a team of deputies who have entered the cell where he is being held and for failing to obey their commands that he remove his clothing. Another video shows a woman being tasered for failing to remove a tongue piercing, despite being adamant that she cannot remove the piercing because it is too slippery. She requests a paper towel to aid her, but, instead of being provided the towel, is tasered. After she is tasered, the deputies provide her with the paper towel, which she uses to successfully remove the piercing.

These allegations and the evidence on the record are sufficient to establish a claim of imminent injury in fact, and thus confer standing at this preliminary stage in the litigation. Worley and Shreve have alleged a custom and policy whereby inmates at the FCCCs are routinely subjected to the pain and danger of being tasered in a manner that violates the constitution. According to the allegations, inmates are tasered with little provocation, when outnumbered by deputies, and when they pose no physical threat to the deputies. While the

Court refrains from inquiring into the merits at this point in the litigation, the video evidence in the record is at least some support of these allegations, rather than mere conclusory accusations.

*Lyons* is distinguishable from the instant case in that it dealt with the possibility of future interactions between a citizen and police officers, whereas the instant case deals with inmates who presumably come into close contact with their guards on a daily basis. Shreve and Worley allege that they (at least while they remained incarcerated) were at risk of future deprivations of their rights and the record does reflect incidents supporting these allegations wherein inmates are tasered for seemingly innocuous reasons or no reason whatsoever. That inmates, including intoxicated or mentally impaired inmates, could be tasered, even when attempting to comply with commands of the deputies, suggests that any interaction with the deputies could result in an inmate being tasered. Finally, the Court also finds significant the fact that Shreve and Worley were actually tasered. From this showing, the Plaintiffs have presented some evidence upon which to conclude that they may suffer future injury in fact.

In support of its conclusion that Shreve and Worley have established standing to prospectively challenge the policies and procedures of the FCCCs, the Court has identified several cases in which inmates were found to have standing to challenge jail or prison policies that placed them at risk of injury. For instance, in *Smith v. Arkansas Department of Correction*, 103 F.3d 637 (8th Cir. 1996), inmates sought to enjoin a policy of the state corrections department that allowed dozens of inmates to be housed together in large barracks without supervision from prison staff. *See id.* at 640–41. According to the inmates, one of whom was stabbed during the night by another inmate, the policy placed them at risk of cruel and unusual punishment in the form of inmate on inmate violence. *Id.* at 640. In holding that one of the inmates had standing to challenge the conditions in the barracks (the inmate who had been

stabbed had been transferred to another facility prior to the initiation of the suit), the Eighth

Circuit found that the conditions that can be present in open barracks, e.g. "thievery, assaults,

and hand-crafted weapons," supported a finding of an imminent injury in fact. *See id.* at 643–44.

The court stated, "[w]e bear in mind . . . that an inmate 'does not have to await the

consummation of threatened injury to obtain preventive relief.'" *Id.* at 644 (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 845 (1994) (internal quotation omitted)).

In *Williams v. Wilkinson*, 132 F. Supp. 2d 601 (S.D. Ohio 2001), Judge Marbley held that

an inmate had standing to seek an injunction barring future application of prison disciplinary

procedures that the inmate claimed violated Due Process requirements. *See id.* at 605. In so

holding, Judge Marbley distinguished that case from *Lyons* on several grounds, including that

"Mr. Lyons's potential for future harm was based on the realization of several incremental steps,

each laced with speculation" whereas, in the case before him, "only one step would be necessary

to reach the complained of conduct: an allegation by a corrections officer that the Plaintiff

violated a prison rule." *Id.* at 605–06. Judge Marbley explained:

> the odds of the Plaintiff coming into contact with a correction officer are much
> greater than Mr. Lyons coming into contact with a police officer in the city of Los
> Angeles. By virtue of his confinement, Mr. Williams is in continual contact with
> correction officers whose job it is to scrutinize closely his behavior for possible
> rule infractions.

*Id.* at 606. Further grounds for distinguishing Lyons included that:

> the correction officer would be following procedure when he or she filed a report
> against Mr. Williams for an alleged violation, while the police officer in *Lyons*
> arguably would be committing an unconstitutional act by using physical force
> against a compliant citizen. As for the next step, a correction officer would have
> one choice once he or she believed that Mr. Williams had committed a rule
> infraction: to file a charge against him. Conversely, a police officer who had
> stopped Mr. Lyons could initiate physical contact in many different ways, or opt
> not to engage in physical contact but merely ticket the traffic violator.

> Finally, the correction officer would be following [the prison]'s policy when he or
> she filed a charge against him, in contrast to the police officer in *Lyons* who
> would be in violation of city policy when he or she chose to place a nonresisting
> citizen in a chokehold.

*Id.*

The Court notes that the question of Worley and Shreve's standing is very close.  As

stated in *Lujan*, the burden of establishing standing will remain with them throughout the

litigation, and the weight of that burden will increase as the litigation proceeds.  The Court also

notes that, as a practical matter, the intervention of the Department of Justice at this point means

that claims for prospective relief resting on identical factual circumstances as those of Shreve

and Worley will move forward regardless of the status of those individual Plaintiffs.

### B. Class Certification

Having determined that Shreve and Worley have standing to seek injunctive relief, the

Court now considers whether their proposed class should be certified under Rule 23.  For the

reasons that follow, the Court grants class certification on a provisional basis.

### 1. Rule 23

A plaintiff has the burden of proving class certification is proper.  *Beattie v. CenturyTel,*

*Inc.*, 511 F.3d 554, 560 (6th Cir. 2007); *see also In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th

Cir. 1996).  The four prerequisites of a class action are found in Rule 23(a) and include the

following:

> (1) the class is so numerous that joinder of all members is
> impracticable,
> (2) there are questions of law or fact common to the class,
> (3) the claims or defenses of the representative parties are typical
> of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

FED. R. CIV. P. 23(a). These prerequisites are often referred to as the numerosity, commonality, typicality, and adequacy of representation requirements.

If a plaintiff satisfies the prerequisites of Rule 23(a), she must additionally "show that her suit falls within one of the three types of class actions under [Rule] 23(b)." *Beattie*, 511 F.3d at 560. Here, Shreve and Worley seek certification under Rule 23(b)(2), which calls for them to establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

The requirements for class certification are discussed in more detail below.

### 2. Rigorous Analysis and Avoidance of the Merits

In order to determine whether a plaintiff has met the standards of Rule 23, the Court will employ a "rigorous analysis." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see also Beattie*, 511 F.3d at 559; *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). This rigorous analysis, though, cannot include a determination of the merits of the case. The Supreme Court has held: "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974); *see also Beattie*, 511 F.3d at 560. Thus, the Court's rigorous analysis must be limited to the substance and structure of Plaintiffs' claims, rather than an inquiry into the merits. *See Beattie*, 511 F.3d at 561; *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) (holding that the court should not conduct a preliminary inquiry into the merits; noting that "whether the class members can win on the merits of the issue

common to the class is not a factor in determining whether [the lead plaintiff's] claim is typical").

The Court has broad discretion in deciding whether to certify a class; however, the Court must exercise that discretion within the framework of Rule 23. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

### 3. Discussion

The Court will first discuss issues of class definition and membership followed by an analysis of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Then, because Plaintiffs Shreve and Worley seek certification under Rule 23(b)(2), it will discuss the requirements of that subsection.

#### a. Class Definition & Membership

Shreve and Worley propose the following class definition: "[a]ll persons who, now or at any future time during the pendency of this litigation, are or will be placed in the custody of the Franklin County Sheriff's Department at the Franklin County Corrections Centers." (Am. Compl. ¶240.)

"[I]mportant elements of defining a class include: (1) specifying a particular group at a particular time frame and location who were harmed in a particular way; and (2) defining the class such that a court can ascertain its membership in some objective manner." *Edwards v. McCormick*, 196 F.R.D. 487, 491 (S.D. Ohio 2000) (citing *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986)). These elements are met by the above-proposed definition. Membership in the class will be objectively ascertainable by a review of the records of the FCCCs. Obviously, class membership will fluctuate throughout the course of this litigation. However, that class membership may be transitory is of minimal significance because of the type

of relief sought. Plaintiffs' objective is to enjoin alleged unconstitutional practices at the FCCCs. Accordingly, the focus of this litigation will be on how the FCCCs are run, not necessarily the identity of individual inmates.

Defendants assert that issues of class identification and administration are fatal to class certification. They contend that determining whether individual inmates and Shreve and Worley themselves are members of the proposed class will require individualized determinations to see if those inmates actually have been subjected to excessive force. Defendants' assertions on this point misconstrue the nature of Plaintiffs' prospective class and the nature of the class's claims. Plaintiffs have not alleged that every inmate at the FCCCs has been tasered or subjected to excessive force. Nor have they attempted to certify a class only of individuals who have been tasered. What they are alleging is that a policy or practice exists whereby inmates are routinely tasered in violation of their constitutional rights. According to them, the practice of using tasers in this manner is so pervasive that all inmates at the FCCCs are at risk of being injured. Accordingly, based on these allegations, the only prerequisite to class membership is incarceration at one of the FCCCs and whether a prospective class member has actually been subjected to excessive force is irrelevant to the consideration of class membership.

### b. Requirements of Rule 23(a)

### i. Numerosity

Rule 23(a)(1) requires the class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). There is not a specific number that automatically qualifies a class for certification as "[i]mpracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976) (citing *Cash*, 434 F.2d at 571). When class size

reaches substantial proportions, however, the numerosity requirement is usually satisfied by the numbers alone. *In re Am. Med. Sys.,* 75 F.3d 1069, 1079 (6th Cir.1996); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006).

Here, the record indicates that the average daily inmate population at the FCCCs in June 2010 was 1,910. (Herrell Aff. Ex. A1.) Further, since 2005, the monthly daily average number of inmates has never dropped below 1,700 inmates. (*See* Herrell Aff. Ex. A1.) A class size of nearly 2,000 renders joinder of all members impractical and Shreve and Worley have thus met their burden of establishing numerosity. *See, e.g., Afro Am. Patrolmen's League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974) (holding that numerosity requirement was satisfied where putative class consisted of no more than thirty-five members). Defendants assert that, because Shreve and Worley have only identified eleven alleged instances where inmates were subjected to excessive force through the use of tasers, joinder of all plaintiffs would be practical. If Shreve and Worley's proposed class consisted only of inmates who have been tasered, this argument would potentially have merit. However, Shreve and Worley have proposed as a class all inmates presently incarcerated at the FCCCs. Based on that definition, the numerosity requirement is easily satisfied.

### ii. Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). However, the claims of the potential class members need not be factually identical. *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 608 (S.D. Ohio 2003) (citing *Putnam v. Davies*, 169 F.R.D. 89, 93 (S.D. Ohio 1996)). Furthermore, there need only be one question common to the class. *Bovee*, 216 F.R.D. at 608 (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)). The mere fact that questions peculiar to individual class

members could remain does not necessarily defeat a finding of commonality. *Id.* (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 476 (S.D. Ohio 2001)).  On the other hand, "[i]t is not every common question that will suffice [as,] at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Sprague v. Gen. Motors Co.*, 133 F.3d 388, 397 (6th Cir. 1998).  However, a finding of commonality is appropriate where there "is a common issue the resolution of which will advance the litigation." *Id.*  Finally, conclusory allegations of commonality are insufficient to satisfy the burden of proof on certification. *Bovee*, 216 F.R.D. at 608 (citing *Falcon*, 457 U.S. at 157; *Am. Med. Sys.*, 75 F.3d at 1081).  Ultimately, as with the other prerequisites, Plaintiffs have the burden of proving to the Court that "questions of law or fact common to the class" exist.

As with the numerosity requirement, Plaintiffs satisfy the commonality requirement. Questions of fact and law common to all members of the class include whether there exists at the FCCCs a pattern or practice of the use of tasers in violation of the constitutional right of inmates to be free from excessive force.  If Shreve and Worley are able to establish such a pattern or practice, such showing will advance the claims of all members of the class.

### iii. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).  A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Am. Med. Sys.*, 75 F.3d at 1082 (citing 1 NEWBERG § 3-13, at 3-76).  Typicality requires that the "representative's interests [are] aligned with those of the represented group, and in pursuing his

22

own claims, the named plaintiff will also advance the interests of the class members." *Id.* In other words, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. However, the plaintiff satisfying his or her own claim is not enough. "[T]he typicality requirement is not satisfied when a plaintiff can prove his own claim but not 'necessarily have proved anybody else's claim.'" *Beattie*, 511 F.3d at 561 (quoting *Sprague*, 133 F.3d at 399). Finally, similar to the commonality requirement, the named plaintiff's claims do not have to be identical to the claims and defenses of the other members of the putative class, and need not always involve the same facts or law, provided there is a common element of fact or law. *Beattie*, 511 F.3d at 561 (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976)); *Putnam*, 169 F.R.D. at 94.

Shreve and Worley's claim for injunctive relief is typical of the claims of the proposed class. The essence of this claim is that a policy or practice exists at the FCCCs that routinely puts inmates at risk of being subjected to excessive force through the use of tasers. If Shreve and Worley are able to advance or succeed on their claim by establishing that such a practice exists, they will also advance the claim made by the class, which is identical. Because the claims are identical, there is little likelihood that Shreve and Worley could prove their own individual claims for injunctive relief and not necessarily prove those of the other class members.

Defendants allege that because different inmates have different statuses, e.g. as arrestees, pretrial detainees, and convicted prisoners, and that different legal standards apply (Fourth Amendment for arrestees, Eighth Amendment for convicted prisoners, and Fourteenth Amendment for pretrial detainees), the claims of Shreve and Worley cannot be said to be typical of the claims of the entire class. It is true that determining whether a pattern or practice of constitutional violations exists will require the finder of fact to evaluate whether the use of tasers

23

in individual cases is unconstitutional. This inquiry will possibly require the application of different constitutional standards depending on the status of the inmate involved and may require the creation of sub-classes. However, because the class's claim focuses on the policy and practice, resolution of the claim will not involve the finder of fact making determinations as to whether every individual class member was subjected to excessive force.

### iv. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Beattie*, 511 F.3d at 562 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)). The adequacy requirement is essential to due process because the final decision is binding on all class members. *See Am. Med. Sys.*, 75 F.3d at 1083 (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)). The Sixth Circuit has developed two criteria for determining whether representation is adequate: (i) "[t]he representative must have common interests with unnamed members of the class" (common interests); and (ii) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel" (vigorous prosecution). *Senter*, 532 F.2d at 525.

The first requirement overlaps with the commonality and typicality requirements and acts to ensure that the representative has interests co-extensive with, rather than antagonistic to, the interests of the other class members. *Day v. NLO, Inc.*, 144 F.R.D. 330, 335 (S.D. Oh. 1992). A plaintiff may not be an adequate representative if that plaintiff is subject to unique defenses that place him or her in a position that is antagonistic to the interests of the class. *See Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 179 (N.D. Ohio 1998). Here, the Court finds that the interests

24

of Shreve and Worley are common to the other members of the class as nothing in the record indicates that Shreve or Worley's positions could somehow become antagonistic to the class.

For a plaintiff to adequately represent a class, it must appear that the plaintiff will vigorously prosecute the case to the benefit of itself and the class members alike. The representative plaintiff must have the financial resources and a sense of personal involvement in the litigation. *Day*, 144 F.R.D. at 335 (citing WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1767 (1986)). Further, the representative plaintiff's counsel must be able to meet the demands of the litigation. *Id.* Plaintiff's counsel must be qualified, experienced, and able to conduct the litigation as necessary. *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). As with the commonality prong, nothing in the record indicates that Shreve and Worley would not adequately represent the interests of the class. To the contrary, through their attorneys, they have thus far vigorously prosecuted this action. Their attorneys have also demonstrated their competence in representing Shreve and Worley's interests, and the interests of the proposed class.

### c. Requirements of Rule 23(b)(2) for Certification

In addition to establishing each of the requirements of Rule 23(a), before a class can be certified, Plaintiffs must demonstrate that the class action falls within one or more of the types established by Rule 23(b). Here, Plaintiffs assert that their action is brought pursuant to Rule 23(b)(2), which states that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

The Court agrees that Shreve and Worley have established an action under Rule 23(b)(2). They allege a policy or practice, created and maintained by Defendants, that affects all of the

members of the proposed class.  Additionally, if the injunction sought by Shreve and Worley is granted, it will appropriately benefit all class members.

### d. Appointment of Class Counsel

Pursuant to Rule 23(g), the Court appoints counsel for Plaintiffs as class counsel in this matter.  As already stated in Section V.B.3.b.iv., *supra*, counsel for Plaintiffs have thus far shown competence and vigor in representing the interests of the proposed class.  Furthermore, the Ohio Legal Rights Service, the employing agency of Plaintiffs' counsel, has been involved in numerous class actions and attorneys for the Ohio Legal Rights Service have significant experience in complex litigation and class action litigation.  Finally, the Court finds that counsel for Plaintiffs have effectively investigated potential claims in this action, and have demonstrated that they will commit the necessary resources to representing the class.

### e. Provisional Basis of Class Certification

The Court's grant of class certification is done on a provisional basis based on the limited record presently before it.  As noted in Part V.A., *supra*, the burden will remain on Shreve and Worley to establish standing to seek injunctive relief as the litigation progresses.  In the Court's view, the potential deficiencies in maintaining standing applicable to the class representatives are equally applicable to every member of the class.

### VI. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (4); Interested Party the United States of America's Motion to Intervene (Doc. 45); the Motion of the National Fraternal Order of Police to File an Amicus Brief on Behalf of Defendants (Doc. 62.); and Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 66).  Plaintiffs' Motion to Compel Inspection (Doc. 14) is hereby

**DISMISSED**.  The Clerk shall add the United States as a full party, Plaintiff-Intervenor to this action and enter the United States' Complaint in Intervention on the docket.  The National Fraternal Order of Police may appear in this action as an amicus curiae and file a brief and other memoranda of law on behalf of Defendants.  A class consisting of "all persons who, now or at any future time during the pendency of this litigation, are or will be placed in the custody of the Franklin County Sheriff's Department at the Franklin County Corrections Centers" is hereby certified on a provisional basis and counsel for Plaintiffs are appointed class counsel to represent the class.

**IT IS SO ORDERED.**

12-14-2010
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**