UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Shreve, et al.,** | : | **Case No. 2:10-cv-644** |
| Plaintiffs, | : | |
| -vs- | : | **Judge: Sargus** |
| **Franklin County, Ohio et al.,** | : | |
| Defendants. | : | **Magistrate Judge: Abel** |

### AGREEMENT BETWEEN PLAINTIFFS AND DEFENDANTS

This agreement is entered into by Plaintiffs Robert Shreve and Michael Worley as Class Representatives in the matter of *Shreve et al. v. Franklin County, Ohio et al.* on behalf of the certified class, defined as: "All persons who, now or at any future time during the pendency of this litigation, are or will be placed in the custody of the Franklin County Sheriff's Office at the Franklin County Corrections Centers" (hereinafter Plaintiffs), and by Defendants Franklin County, Sheriff Karnes, Chief Deputy Barrett, Chief Deputy Martin, Lt. Klump, Lt. Forino, Major Stobart, Sgt. Williamson, Major Hanes, Major Herrell, and Major Edgington in their Official Capacities and their successors (hereinafter FCSO). This agreement shall be subject to the approval of the Court pursuant to Fed. R. Civ. P. 23(e), and Plaintiffs and FCSO agree to support this agreement in any such proceeding.

Plaintiffs and FCSO hereby incorporate by reference Sections I, II, III, V, and VI of the Agreement Between the United States of America and the Sheriff of Franklin County, Ohio entered into on February 4, 2011 and attached hereto and agree that those Sections will form the basis of the agreement herein.

Plaintiffs and FCSO further agree to the following:

1. FCSO shall provide contemporaneously to Plaintiffs all materials provided to DOJ pursuant to the Implementation and Compliance Section IV of the attached Agreement Between the United States of America and the Sheriff of Franklin County, Ohio. Upon request by Plaintiffs, FCSO also shall provide to Plaintiffs policies, training materials and courses, and FCSO records regarding Taser use in a timely manner not to exceed 30 days.

2. FCSO shall notify counsel for the Plaintiffs of any scheduled DOJ compliance visit and counsel for the Plaintiffs may be present during all DOJ compliance visits.

3. If Plaintiffs determine that FCSO is not in compliance with this Agreement, Plaintiffs shall provide a Notice of Non-compliance to FCSO. During the 30 days following the receipt of a Notice of Non-compliance, the Plaintiffs and FCSO shall coordinate and discuss any areas of disagreement and attempt to resolve outstanding differences. However, in the case of an emergency posing an immediate threat to the health and safety of inmates, Plaintiffs may seek enforcement action without regard to the notice and negotiation requirements herein.

4. If the parties cannot reach an agreement within the 30 days following the receipt of a Notice of Non-compliance, the parties agree to enter into mediation under the direction of a magistrate judge or any other neutral party appointed by the Court and to engage in good faith negotiations with such a mediator to resolve such differences promptly and effectively. These negotiations will last for a maximum of 30 days from the inception of the proceedings.

5. If Plaintiffs and FCSO fail to reach an agreement at the conclusion of mediation, Plaintiffs are not limited in any fashion in pursuing compliance with this agreement without further notice, including any adverse litigation against FCSO and/or seeking appropriate enforcement of any provision of this agreement.

6.     Within 30 days of the effective date of this Agreement, FCSO shall pay to Ohio Legal Rights Service $30,000 as costs associated with the litigation of Plaintiffs claim for injunctive relief. This Agreement shall not establish prevailing party status for Plaintiffs for purposes of attorney fees or costs. Plaintiffs reserve the right to seek attorney fees and costs for further proceedings in this matter with regard to the individual claims for damages and entity liability, or any subsequent action to seek compliance with this Agreement. FCSO reserves all defenses related to any claim to fees and costs made by the Plaintiffs in the future.

The Parties have read all of the foregoing, understand the same, and agree to all of the provisions contained herein.

*Remainder of Page Left Blank*

*Signature Pages Follow*

Plaintiffs on behalf of the Certified Class:

_____
ROBERT SHREVE

_____
MICHAEL WORLEY

Approved by Counsel for the Certified Class:

_____
Jane P. Perry (0029698)
jperry@olrs.state.oh.us
Trial Attorney for Plaintiffs
Kristen N. Henry (0082382)
khenry@olrs.state.oh.us
Kerstin Sjoberg-Witt (0076405)
ksjoberg-witt@olrs.state.oh.us
Legal Director
OHIO LEGAL RIGHTS SERVICE
50 W. Broad Street, Suite 1400
Columbus, Ohio 43215
(614) 466-7264 - telephone
(614) 644-1888 - fax

4

On behalf of the Defendants:

_____
JAMES A. KARNES
SHERIFF, FRANKLIN COUNTY, OHIO

On Behalf of the Fraternal Order of Police,
Capital City Lodge No. 9,
Columbus, Ohio

_____
JIM GILBERT, PRESIDENT


Approved by Counsel for the F.O.P:

_____
Russell E. Carnahan (0011801)
Hunter, Carnahan, Shoub & Byard
3360 Tremont Road, 2nd Floor
Columbus, Ohio 43221
Telephone: (614) 442-5626
Fax: (614) 442-5625
Email: rcarnahan@hcands.com
Trial Attorney for Defendant,
Fraternal Order of Police,
Capital City Lodge No. 9

# AGREEMENT
# BETWEEN
# THE UNITED STATES OF AMERICA
# AND
# THE SHERIFF OF FRANKLIN COUNTY, OHIO.

## I. INTRODUCTION

1. The parties to this Agreement are the United States of America, represented by the United States Department of Justice ("DOJ") and the Sheriff of Franklin County, Ohio.

2. The Sheriff, Jim Karnes, of Franklin County is the elected officer responsible for the operations of the Franklin County Sheriff's Office ("FCSO"), Franklin County Correctional Center I ("FCCC I"), and Franklin County Correctional Center II ("FCCC II"). The Sheriff shall require that employees and contractors of FCSO take all actions necessary to comply with the provisions of this Agreement. The provisions of this agreement shall only apply to the deployment of electrically charged weapons, popularly referred to as CEDs, in FCCC I and FCCC II.

3. On July 16, 2010, Robert Shreve, Michael Reed, and Dawn Fiore-Bruno, et. al., submitted a Complaint in the United States District Court for the Southern District of Ohio (Eastern Division). The civil action was filed pursuant to 42 U.S.C. § 1983. In an amended complaint filed August 27, 2010, Michael Worley was named as a plaintiff and a class representative seeking injunctive relief. The plaintiffs alleged that FCSO deputies engage in the excessive and disproportionate use of force, in violation of rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States. Specifically, they alleged that FCSO deputies frequently rely on CEDs without proper justification. The Defendants have denied all allegations.

4. On December 14, 2010, the United States intervened in *Shreve, et al., v. Franklin County, Ohio, et al.,* No. 2:10-cv-644 (S.D. Ohio, filed July 16, 2010). The United States intervened pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.

5. DOJ recognizes the Sheriff's high level of cooperation and willingness to enter into this Agreement without need for litigation. As a result of this cooperation, the parties believe this Agreement represents the best opportunity to address the United States' concerns with FCSO training and use of CEDs. Neither the Sheriff's entry into this Agreement, nor the Sheriff's decision to implement changes to FCSO policies and procedures, constitutes an admission by the Sheriff, FCSO, or any officer or employee of FCSO, that they have engaged in any unconstitutional, illegal or otherwise improper activities or conduct.

1

6. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. This Agreement is not intended to impair or expand the right of any person or organization to seek relief against the Sheriff or his officials, employees, or contractors for their conduct. This Agreement does not alter legal standards governing any such claims, including those standards established by Federal or Ohio law.

7. The parties agree that it is in their mutual interests to avoid litigation. The parties further agree that resolution of this matter pursuant to this Agreement is in the best interests of FCSO, persons brought into FCCC I and FCCC II for processing and acceptance into the facilities, or those who are confined in FCCC I and FCCC II. Now, therefore, pursuant to Fed. R. Civ. P. 41(a)(2), the parties hereby agree to file this Agreement in the United States District Court for the Southern District of Ohio, together with a motion to conditionally dismiss the Complaint under the conditions set forth in this Agreement. The parties further agree that this case will remain on the Court's inactive docket during the term of, and subject to, this Agreement, and that, from time to time, the Court may hold, at the request of either party, status conferences for the sole purpose of assisting the parties to informally resolve disputes, if any, until this Agreement terminates. The Court will retain jurisdiction only to resolve disputes between the parties, in accordance with the dispute resolution provisions set forth in Section IV of this Agreement.

8. Nothing in this Agreement is intended to alter any existing collective bargaining agreements, or equivalents thereof, between the Sheriff and the FCSO employee bargaining unit or impair the collective bargaining rights, or the equivalents thereof, of employees in those units under state and local law, including FCSO employees' right to notice of, and representation during, interviews, as appropriate.

9. It is the explicit intention of the Parties to this Agreement that this Agreement is binding on the Sheriff's successors, should the Agreement exceed the length of Sheriff Karnes's term as Sheriff.

## II. DEFINITIONS

10. "FCSO" shall refer to the Franklin County Sheriff's Office, Franklin County, Ohio.

11. "FCCC I" shall refer to Franklin County Correctional Center I, located at 370 S. Front Street, Columbus, Ohio.

12. "FCCC II" shall refer to Franklin County Correctional Center II, located at 2460 Jackson Pike, Columbus, Ohio.

13. "Sheriff" shall refer to the Franklin County Sheriff and his or her deputies, employees (sworn and unsworn), contractors, and successors in office.

2

14. "Deputy Sheriffs" or "deputies" shall refer to sworn deputies of all ranks of the FCSO.

15. "DOJ" shall refer to the United States Department of Justice, which represents the United States in this matter.

16. "CEDs" shall refer to "conducted energy devices" currently used by FCSO, or any other similar type or model of electro-muscular disruption weapons, or its equivalent, employed by FCSO during the pendency of this Agreement.

17. "Subject" shall refer to the person against whom the CED is deployed.

18. "Include" or "including" shall mean "include, but not limited to" or "including, but not limited to."

19. "Drive Stun" shall refer to the use of the CED in which the deputy removes the cartridge (or the cartridge remains on the CED but the probes have already been deployed) and presses the weapon against the subject's body.

20. "Effective date" shall mean the date this Agreement is signed by all the parties.

21. "FCSO TASER Policy" shall mean the FCSO written Use of Force Policy that covers CED use.

22. "Active Aggression" shall mean a threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is likely to occur.

23. "IAB" shall refer to FCSO's Internal Affairs Bureau deputies.

24. "Spark Test" shall refer to the pre-operational check of the CED, and includes removing the cartridge of the CED, pointing the CED in a safe direction, and pulling the trigger to ensure that the electrodes are working.

25. "Train" means to instruct in the skills addressed to a level that the trainee has the demonstrated proficiency to implement those skills as and when called for in the training. "Trained" means to have achieved such proficiency.

26. "Interpersonal Communication (IPC)" shall mean skills designed to allow for the de-escalation of any given situation, with the purpose of avoiding the need for the use of force.

27. "Boilerplate" shall refer to language that is stock and/or formulaic and fails to attest to the unique facts of a use of force incident.

3

28. Throughout this Agreement, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance. "Substantial compliance" indicates that FCSO has achieved compliance with most or all components of the relevant provision of the Agreement. "Partial compliance" indicates that compliance has been achieved on some of the components of the relevant provision of the Agreement, but significant work remains. "Non-compliance" indicates that most or all of the components of the Agreement provision have not yet been met.

## III. SUBSTANTIVE PROVISIONS

A. **FCSO TASER POLICY**: the Sheriff shall develop, implement, provide training on, and enforce policies that have been provided to DOJ. These policies shall comply with the following:

29. Constitutional Standard: FCSO's Taser policy shall explain Fourth, Eighth, and Fourteenth Amendment standards regarding the use of force, specifically stating that CED deployment be constitutionally appropriate in light of the facts and circumstances surrounding the deployment.

30. Absent exigent and exceptional circumstances, the CED shall not be deployed against any person who is not reasonably perceived to pose a threat to the safety of the deputy or others and is not resisting by use of physical force or by displaying Active Aggression against the deputy or others, or who questions a deputy's commands in a non-violent manner, or who remains in a limp or prone position. When such exigent and exceptional circumstances exist, IPC and alternative forms of force or control techniques shall be considered first and rejected only if there is an objectively reasonable basis that alternative forms of force or control techniques would be unsafe. Exigent and exceptional circumstances may include an immediate enforcement necessity that cannot be safely achieved by alternative forms of force or control techniques.

   a. "Alternative forms of force or control techniques" shall include the following:
      i. escort technique
      ii. soft empty hand control
      iii. handcuffing
      iv. pressure point techniques

   b. Factors to be considered before deploying the CED in the exigent and exceptional circumstances described in this Section: When considering alternative forms of force or control techniques and whether there is an objectively reasonably basis for whether they would be unsafe, the deputy deploying the CED shall consider factors that include: subject's age; prior behavior; size; charges (if known); number of other deputies available; location of the event; ability to place subject in a secure cell; immediate enforcement necessity.

4

    c. If IPC and alternative forms of force or control techniques have been considered and rejected as described above, a CED shall not be deployed in the exigent and exceptional circumstances described in this Section unless the deputy deploying the CED has taken the following steps: ensured that a lawful, direct command was clearly given; reasonably perceived that the subject heard the command; reasonably perceived that the subject understood the command; repeated the command at least once; provided for the filming or recording of the incident (unless impracticable); verbally warned the subject that he or she would be subject to tasing; performed an arc/display of the CED (unless impracticable).

    d. If alternative forms of force or control techniques are not used, the deputy who deployed the CED in such exigent and exceptional circumstances shall articulate in the use of force reporting (1) why other alternative forms of force or control techniques were considered but rejected, and (2) why the deputy had to use the CED.

    e. Post-CED deployment review: IAB shall immediately alert the Chief of Investigation upon receiving notification that FCSO applied a CED pursuant to the provisions of this Section. The Chief of Investigation shall conduct a thorough review that includes reviewing any available use of force videos, and reading the entire use of force report. If, upon review, it appears that CED deployment pursuant to this Section was unwarranted, the Chief of Investigation shall recommend that the IAB conduct a full investigation of this use of force. If, upon review, the Chief of Investigation determines that no investigation is warranted, the Chief shall articulate in writing the basis for that conclusion.

31. CED Deployment Against Certain Subjects: Consistent with the appropriate constitutional standard, FCSO's TASER policy shall prohibit the deployment of the CED, except when there is an objectively reasonable threat to an individual's safety, a display of active aggression, or an attempt to flee or escape, against the following:

    a. Subjects situated in an environment such that the subject's fall may cause substantial injury or death (e.g., standing on an elevated or unstable surface; standing in or near an object that may cause serious bodily injury; or climbing a fence or wall);

    b. Subjects known or reasonably believed to be pregnant; or

    c. Subjects who have a mental or physical impairment or are intoxicated due to drugs or alcohol such that it is reasonably perceived to be impossible or impracticable to comply with an order. A deputy shall consider any known or apparent mental or physical impairment or intoxication due to drugs or alcohol in determining whether there is an objectively reasonable basis to deploy the CED.

32. Restrained Subjects: FCSO's CED policy shall prohibit CED deployment against handcuffed or otherwise manually or mechanically restrained subjects unless: (1) the

restrained subject is endangering the safety of the deputy or others by attempting to employ physical force that is reasonably perceived to pose a threat of injury to a deputy, the subject, or others; or (2) it is the constitutionally proportionate amount of force necessary to overcome resistance to a legitimate penological purpose.

33. CED Deployment Practices: FCSO's TASER policy shall:

    a. require that reasonable efforts be made to minimize the number of CED exposures;

    b. instruct deputies to use the lowest number of CED exposures that are objectively reasonable to accomplish lawful objectives;

    c. instruct deputies to pause and evaluate the situation after the initial application of the CED before attempting another application, unless the subject presents an imminent risk of bodily harm that prevents such evaluation;

    d. prohibit restraint techniques that will impair a subject's respiration after the subject has been subdued following a CED deployment;

    e. prohibit the use of a CED unless it is the constitutionally proportionate amount of force necessary to overcome resistance; and

    f. prohibit the use of a CED as a punitive, abusive, or retaliatory measure.

34. FCSO shall enforce its existing policy regarding the evaluation of suicide risk assessment and whether such assessment requires a subject to be placed in a safety gown.

35. The FCSO TASER policy shall require deputies to articulate the following in completing their use of force reports:

    a. describe the facts that were known by the deputy at the time the CED was deployed;

    b. describe the level of threat perceived by the deputy at the time the CED was deployed;

    c. describe what alternative types of force or control techniques they considered and why those types of force were rejected;

    d. require deputies to fill out a use of force report following the use of a CED that sets forth each deputy's independent observation regarding the use of the CED that is based solely upon the deputy's understanding and perception of the circumstances surrounding the incident;

6

 e. require an effort by a deputy, other than the deputy who deployed the CED, to obtain a written inmate statement following a use of a CED; and

 f. make clear that the deputy involved in the use of a CED does not approve, but is authorized to receive and convey, any use of force reports associated with the use a CED.

36. Responsibilities of Internal Affairs Bureau: FCSO's CED policy shall require its Internal Affairs Bureau to:

 a. be trained in usage of the CED; and

 b. evaluate all CED deployments by a deputy or supervisor by:

  i. securing and reviewing any videos, if utilized;

  ii. reviewing all relevant use of force reports;

  iii. reviewing photographs of all relevant evidence, including, when possible, impact points of the CED probes before and after removal from the subject;

  iv. completing a written report of findings following each assessment of CED deployment that includes a statement/finding of the following:

   1. a summary review of the incident;

   2. the reason for the use of force;

   3. whether the subject was actively resisting or exhibiting Active Aggression, and if so, how;

   4. a comparison of any videos to the use of force reports, which notes any inconsistencies; and

   5. whether the use of force complied with all respects of the FCSO CED and Use of Force Policies, with an explanation of the reasons for this statement/finding.

  v. ensuring that the deputy places the spent CED cartridge and probes into evidence control;

  vi. instructing deputies to produce the CED to download the CED deployment data to assess the time of the deployment, the number of deployments, and the duration of each deployment;

7

      vii. ensuring that if a violation of law or policy is suspected, the incident is immediately authorized for a full investigation; and

      viii. in any incident in which the reviewing supervisor or IAB believes that there may have been a violation of FCSO policy, interviewing the deputy, the subject, and other witnesses in a timely manner.

37. Medical and Mental Health Responses: FCSO's TASER policy shall ensure:

   a. that subjects receive an adequate post-deployment medical evaluation; and

   b. that subjects are referred for a mental health evaluation if recommended by the evaluating medical provider.

**B. FCSO TASER TRAINING**: the Sheriff shall demonstrate substantial compliance with the following:

38. FCSO agrees to continue to issue CEDs only to corrections deputies who have taken and successfully completed the CED training course.

39. FCSO agrees that FCSO's annual in-service training requirements will include training with regard to proper CED use as part of the use of force training module for those deputies who have been issued CEDs.

40. FCSO agrees to maintain records of CED certification.

41. FCSO agrees to not rely solely upon the CED manufacturer's printed and electronic training materials. In addition to the materials from the CED manufacturer, FCSO shall develop and implement its own training program, which may include materials from other law enforcement or corrections departments. The FCSO training program will include testing procedures to best develop the CED knowledge, skills of its deputies as tailored for the needs of FCSO, and deputies' understanding of when CEDs should be deployed in relation to other uses of force under Federal Constitutional standards.

42. FCSO agrees to train deputies to avoid multiple activations and continuous cycling of the CED.

43. FCSO training shall incorporate practical scenario-based training exercises to drill deputies on CED deployment skills. For example, deputies shall be instructed, drilled, and tested on how to:

   a. give a verbal warning to the subject and other deputies;

   b. work together with other deputies as a team;

8

    c. use the constitutionally proportionate level of force objectively necessary to safely resolve a situation;

    d. pause and assess the situation after deploying a CED;

    e. assess subjects for physical and mental conditions that may make the use of a CED undesirable;

    f. recognize symptoms of mental illness and physical impairment; and

    g. use IPC, de-escalation, or regrouping techniques in addition to tactics involving the use of a CED.

44. FCSO agrees to continue supervisor training dedicated to supervisor response and documentation of the incident. The course material shall cover such aspects of supervisor response and documentation as:

    a. obtaining written statements from all involved deputies, witnesses, and the subject;

    b. completing a use of force report summary; and

    c. obtaining photographs and use of force/CED forms.

45. FCSO agrees to routinely update and review CED policies and training materials.

**C. FCSO TASER ACCOUNTABILITY PROCESSES**: the Sheriff shall demonstrate substantial compliance with the following:

46. FCSO will continue to use its use of force form that records CED information, including:

    a. the serial number of the CED and CED cartridge;

    b. information regarding the deployment (e.g. unholstered only, unholstered and deployed and hit or missed target);

    c. distance from subject and environment of the location;

    d. number of cycles deployed;

    e. whether a drive-stun was employed;

    f. a detailed description of the resistance demonstrated by the subject and the specific facts surrounding the CED deployment without use of boilerplate language;

9

      g. statements from the subject;

      h. injuries and medical care provided;

      i. names of witnesses;

      j. type of crime, infraction, or violation involved; and

      k. type of clothing worn by subject.

47. FCSO shall perform a thorough, independent investigation of all CED cases in which:

      a. the subject dies or suffers serious bodily injury after application of the CED;

      b. a subject is subjected to prolonged or multiple applications of the CED when the necessity of such application is not apparent;

      c. the CED appears to have been used in a punitive, abusive, or retaliatory manner; or

      d. there appears to be a material deviation from FCSO TASER policy.

48. FCSO shall download the data from a CED after every CED application other than spark tests.

## IV. IMPLEMENTATION AND COMPLIANCE

49. Substantial compliance with this Agreement will be based on the entirety of the Agreement. Sub-paragraphs are not severable.

50. Within one month of the effective date of this Agreement, FCSO shall communicate to all FCSO corrections and IAB employees, and others implicated by this Agreement, the requirements set forth in this Agreement.

51. Within three months of the effective date of this Agreement, FCSO shall provide its policies to DOJ, and shall also provide DOJ and its law enforcement consultants with access to FCCC I, FCCC II, and the training divisions to assess FCSO's level of compliance with the terms of this Agreement. FCSO's counsel, Plaintiffs' counsel, and counsel for the Fraternal Order of Police may be present during all DOJ compliance visits, with the exception of any detainee interviews, if applicable. DOJ may issue a written report 45 days after the end of the initial compliance visit and subsequent compliance visits. All written reports shall include findings of substantial compliance or non-compliance with respect to each provision of this Agreement. When appropriate, DOJ will provide FCSO with recommendations and technical assistance that may help it meet the substantive requirements of this Agreement.

52. If DOJ determines that FCSO is not in substantial compliance with the provisions of this Agreement, DOJ shall so state in its written report and provide the factual basis for the findings, including, as appropriate: the identities of FCSO deputies involved; dates and times of incidents; and a summary specifying the documents and records DOJ reviewed and the interviews DOJ conducted that support DOJ's determination.

53. If DOJ determines that FCSO is in substantial compliance with all provisions of this Agreement, DOJ shall so state and provide the factual basis for the findings, including a summary specifying the documents and records DOJ reviewed and the interviews DOJ conducted that support DOJ's determination.

54. Prior to any compliance visit, DOJ shall provide 10 days written notice to FCSO. Within seven days in advance of the visit, DOJ shall identify any law enforcement consultants who will participate in the visit.

55. DOJ and its law enforcement consultants shall have full and complete access to FCSO policies, training materials and courses, FCSO records regarding CED use, and FCSO employees, pursuant to paragraph 8, upon reasonable notice to FCSO, pursuant to paragraph 51 above, for the purpose of ascertaining compliance with this Agreement.

56. FCSO shall provide DOJ with FCSO records regarding CED use on a quarterly basis. DOJ shall use FCSO records regarding CED use to identify and track trends in CED use of force. Upon DOJ's recommendation, FCSO shall conduct an investigation to determine whether training opportunities or policy and practice improvements are warranted.

57. FCSO shall respond to any written questions from DOJ concerning FCSO's compliance with this Agreement within 30 days of receipt of such written questions. FCSO shall provide DOJ with access to any requested documents regarding FCSO's compliance with the requirements of this Agreement.

58. FCSO shall maintain sufficient records to document its compliance with all of the requirements of this Agreement, for the duration of the Agreement.

59. FCSO shall designate a compliance coordinator to serve as the single point of contact to DOJ and to oversee the implementation of this Agreement.

60. DOJ and FCSO agree to defend the provisions of this Agreement. DOJ and FCSO shall notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, removal to a federal court shall be sought.

61. This Agreement shall be binding on all successors, assignees, employees, contractors, and all those working for, or on behalf of, FCSO.

62. In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

63. Each party to this Agreement shall bear the cost of their fees and expenses incurred in connection with this Agreement.

64. Throughout the duration of the Agreement, DOJ and its expert law enforcement consultants shall maintain the confidentiality of all information provided pursuant to this Agreement consistent with state and federal law and consistent with the law enforcement responsibilities of DOJ.

65. The parties agree that FCSO will make all good faith efforts to immediately implement and achieve substantial compliance with all substantive requirements of Section III of this Agreement, and the parties anticipate that FCSO will attain substantial compliance with all provisions of the Agreement within six months of the effective date of this Agreement.

66. If DOJ maintains that FCSO has failed to carry out any requirement of this Agreement, DOJ shall notify FCSO of any instance(s) in which it maintains that FCSO has failed to carry out the requirements of this Agreement by providing a written Notice of Non-Compliance.

67. FCSO shall take substantial steps to correct a claim by DOJ pursuant to the terms of this Agreement within a reasonable time, but in no event more than 30 days from receipt of a Notice of Non-Compliance. During the 30 days following receipt of a Notice of Non-Compliance, DOJ and FCSO shall coordinate and discuss any areas of disagreement and attempt to resolve outstanding differences. However, in the case of an emergency posing an immediate threat to the health and safety of inmates, DOJ may seek enforcement action without regard to the notice and negotiation requirements herein.

68. If the parties cannot reach an agreement within the 30 days following the receipt of a Notice of Non-Compliance, the parties agree to enter into mediation under the direction of a magistrate judge or any other neutral party appointed by the Court and to engage in good faith negotiations with such a mediator to resolve such differences promptly and effectively. These negotiations will last for a maximum of 30 days from the inception of the proceedings.

69. If DOJ and FCSO fail to reach an agreement at the conclusion of mediation, DOJ is not limited in any fashion in pursuing its law enforcement obligations without further notice, including any adverse litigation against FCSO or seeking appropriate enforcement of any provision of this Agreement. Any such adverse litigation or enforcement shall be limited to post-agreement compliance.

12

## V. TERMINATION

70. The parties agree that upon FCSO reaching substantial compliance with all provisions in this Agreement, DOJ will then continue to review FCSO's compliance for a period of two years to assess the sustainability of the reforms.

71. The Agreement will terminate after DOJ finds that FCSO is in substantial compliance with each of the provisions of this Agreement and has maintained substantial compliance for at least two years. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance. Temporary compliance during a period of otherwise sustained non-compliance will not constitute substantial compliance.

72. If at any time FCSO maintains that it has reached substantial compliance with this Agreement and has maintained substantial compliance with this Agreement for two years, it may file a motion to terminate the Agreement with the Court, but only after providing DOJ with 30 days notice of its intent to file such a motion, during which period DOJ and FCSO shall coordinate and discuss any areas of disagreement and attempt to resolve the outstanding differences.

73. Failure by any party to enforce this entire Agreement, or any provision thereof, with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines and provisions of this Agreement.

## VI. STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

74. For the purposes of this Agreement only and in order to settle this matter, the parties stipulate that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a). The parties further stipulate and agree that the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to address the violations of federal rights alleged by the United States, is the least intrusive means necessary to address these alleged violations, and is not intended to have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the parties agree and represent that the Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a).

13

Respectfully submitted,

JAMES A. KARNES
Sheriff
Franklin County Sheriff's Office

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Attorney General
Civil Rights Division

JONATHAN M. SMITH
Chief
Special Litigation Section

TAMMIE M. GREGG
Principal Deputy Chief
Special Litigation Section

AARON FLEISHER
ANIKA GZIFA
MARLYSHA MYRTHIL
SERGIO PEREZ
KERRY KRENTLER DEAN
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-6255
aaron.fleisher@usdoj.gov

Attorneys for the United States of America

DATED: February 4, 2011