UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT SHREVE, et al.,

               Plaintiffs,

      v.

FRANKLIN COUNTY, OHIO, et al.,

               Defendants.

 

Case No. 2:10-cv-644
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark R. Abel

NICOLE BRADLEY, et al.,

               Plaintiffs,

      v.

FRANKLIN COUNTY, OHIO, et al.,

               Defendants.

Case No. 2:11-cv-261
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark R. Abel

MICHAEL WORLEY, et al.,

               Plaintiffs,

      v.

FRANKLIN COUNTY, OHIO, et al.,

               Defendants.

Case No. 2:11-cv-415
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark R. Abel

DAWN POWELL,

               Plaintiff,

      v.

FRANKLIN COUNTY, OHIO, et al.,

               Defendants.

Case No. 2:12-cv-70
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

This matter is before the Court on the Motion of Defendants Franklin County, Zachary Scott, Mark Barrett, Stephan Martin, Robert Forino, Stephanie Klumpp, Charles Williamson, Geoffrey Stobart, Michael Herrell, Douglas Edgington, James Dishong, Sam Byrd, Sam Montrose, James Jodrey, Clayton Kern and Chris Starner for Summary Judgment.  (Doc. No. 163.[1])  For the reasons set forth below, the Court **GRANTS** Defendants' motion.

## I. BACKGROUND

### A. Procedural History

This action was originally brought by Robert Shreve, Michael Worley, Dawn Fiore-Bruno and Michael Reed against Franklin County, Ohio, the Sheriff of Franklin County and numerous employees of that Office.  The original complaint, and all subsequent amendments, sought class certification, declaratory and injunctive relief on behalf of the class, and damages on behalf of the individual plaintiffs.  On December 14, 2010, the Court granted the plaintiffs' motion for class certification.  (Doc. No. 69.)

The declaratory and injunctive relief claims were resolved by an agreement of the class and the defendants.  The parties jointly moved for a hearing for final approval of the settlement.  (Doc. No. 95.)  On February 4, 2011, the Court preliminarily approved the class settlement and set a hearing for March 10, 2011.  (Doc. No. 97.)  After the oral hearing was held, the Court granted final approval of the settlement.  (Doc. No. 100.)

On September 7, 2011, the Court granted the plaintiffs' motion to consolidate this action with two others: *Nicole Bradley et al. v. Franklin County, Ohio, et al.*, Case Number 11-cv-261

---

[1]Unless otherwise noted, docket numbers are from Case Number 10-cv-488.

and *Michael Worley et al. v. Franklin County, Ohio et al.*, Case Number 11-cv-415. The *Bradley* case includes as plaintiffs Nicole Bradley, Martini Smith, Dawn Fiore-Bruno and Rebecca Genheimer. Plaintiff Smith was dismissed on December 15, 2011 (Doc. No. 37 in Case No. 11-cv-261) and Plaintiff Genheimer was dismissed on August 17, 2012. (Doc. No. 65 in Case No. 11-cv-261). The *Worley* case includes as plaintiffs Michael Worley, Robert Shreve and Frankie Mosley. Plaintiff Worley was dismissed on December 15, 2011 (Doc. No. 21 in Case No. 11-cv-415) and Plaintiff Shreve was dismissed on August 16, 2012 (Doc. No. 32 in Case No. 11-cv-415).

On March 22, 2012, the Court granted the plaintiffs' motion to consolidate this consolidated action with *Dawn Powell v. Franklin County, Ohio, et al.*, Case Number 12-cv-70. (Doc. No. 6 in Case No. 12-cv-70.)

The defendants filed their motion for summary judgment on September 28, 2012. (Doc. No. 163.) In that motion, the defendants indicate that the claims of Dawn Fiore-Bruno have been settled, and that a dismissal of her claims will be forthcoming within the next several weeks. As of the issuance of this Opinion and Order, Ms. Fiore-Bruno has not been dismissed. In their motion, the defendants move for dismissal Michael Reed, to whom they refer as the only remaining defendant. The Court notes, however, that the following plaintiffs in this consolidated action have not been dismissed: Nicole Bradley and Dawn Fiore-Bruno who are named as plaintiffs in the *Bradley* case; Frankie Mosely who is a named plaintiff in the *Worley* case; and Dawn Powell who is the named plaintiff in the *Powell* case.

Mr. Reed filed his memorandum in opposition to the defendants' motion for summary judgment on his claims (Doc. No. 168) and the defendants filed a reply brief (Doc. No. 169).

3

The defendants' motion is now ripe for review.

## B. Facts

In the early 1990's, Mr. Reed was involved in a motorcycle accident that left him with traumatic brain injury. (Third Am. Compl. ¶ 160; Doc. No. 104.). He has been diagnosed with tonic clonic seizures and complex partial seizures. *Id.* ¶ 161. On August 10, 2008, Mr. Reed had a seizure while walking near the corner of Hamilton Road and Broad Street in Columbus, Ohio. *Id.* ¶ 163. Emergency Medical Technicians ("EMTs") from the Columbus Fire Department responded. *Id.* ¶ 164. When they tried to take him to the hospital, Mr. Reed became aggressive and assaulted one of the EMTs. *Id.* He was taken to Franklin County Corrections Center II ("FCCC II") on a charge of assaulting a peace officer. *Id.* ¶ 165. When he awoke in jail, wearing a suicide gown, he alleges that he did not remember the assault. *Id.* ¶ 166.

On December 23, 2008, Judge Michael Holbrook of the Franklin County Common Pleas Court found Mr. Reed not guilty by reason of insanity ("NGRI") on the assault charge. *Id.* ¶ 167. Mr. Reed was ordered to be committed to the Twin Valley Behavioral Healthcare Forensic Unit. *Id.* ¶¶ 170, 171. Twin Valley did not have an open bed so Mr. Reed stayed at FCCC II until one became available. *Id.* ¶ 171.

On January 29, 2009, Mr. Reed had a seizure in his cell at FCCC II. Defendant Deputy James Jodrey called a "code blue medical" after seeing Mr. Reed sitting on the floor of his cell with blood running down his left eyebrow. (Internal Affairs Report 09-048; Doc. No. 163-3.) A "code blue medical" means that an inmate requires medical attention. (Samuel D. Byrd Dep. at 35; Doc. No. 164-4.) Defendant Corporal Byrd and Defendant Deputies Sam Montrose, Clayton Kern and Christopher Starner responded to the code blue medical. Before the deputies entered

4

the cell, Mental Health liaison Doug Hahn informed Corporal Byrd that Mr. Reed had a seizure, and that previously, upon awaking from a seizure, he had assaulted an emergency responder. (Byrd Dep. at 37–38.)  Corporal Byrd decided it would be best to have control over Mr. Reed before he was seen by medical staff.  *Id.* at 39.

The deputies entered the cell and attempted to handcuff Mr. Reed.  The video recording of this activity shows that the deputies entered the cell where Mr. Reed was sitting on the floor beside his bed.  The deputies informed Mr. Reed that they were there to help him, that they were going to handcuff him for everyone's safety and were going to take him to be seen by the medical staff.  The deputies ordered Mr. Reed to put his hands behind his back several times.  Mr. Reed did not comply.  The deputy behind Mr. Reed took his left hand and cuffed it.  The deputies continued to order Mr. Reed to put his hands behind his back so they could finish cuffing him.  Mr. Reed failed to comply.  A deputy then took Mr. Reed's right hand and attempted to move it behind his back.  Mr. Reed pulled his arm away from the deputy and leaned to his left, grabbing the handcuff that was attached to his left hand.  The deputies ordered him to let go of the cuff and put his hands behind his back or he would be tased.  Mr. Reed did not comply.  Three of the deputies attempted to roll Mr. Reed to his left while attempting to pull his arms behind his back.  Mr. Reed actively resisted, pulling his arms away and rolling onto his side.  Mr. Reed held his hands together in front of him, holding onto the handcuff and pulling against the deputies.  During this whole incident the deputies continued to order Mr. Reed to comply or else be tased.  Corporal Byrd then tased Mr. Reed.  Mr. Reed then said "Okay, Okay, Okay" putting his hands up as if surrendering.

The deputies ordered him to put his hands behind his back immediately.  Mr. Reed did

5

not comply. The deputies then grabbed Mr. Reed's handcuffed arm, attempting again to pull his

hands behind his back. The deputies repeated several times to Mr. Reed that if he continued to

resist he would be tased again. Mr. Reed pulled his hands together in front of him, struggling

with the deputies while he lay on his back, and resisting being handcuffed. Corporal Byrd then

tased Mr. Reed again. At that time, Mr. Reed stopped struggling.

One of the deputies told Mr. Reed to stay calm, that he was going to cuff him and take

him to be seen by the medical staff. The deputies then successfully cuffed Mr. Reed's hands

behind his back while he was laying on his stomach. Mr. Reed started to struggle some when the

deputies put on the leg irons. He was told to stay calm or be tased again. The deputies continued

to indicate that they were trying to help him, trying to get him to see a doctor, and did not want to

tase him again. Mr. Reed completely stopped resisting and allowed the deputies to help him

stand up. The deputies asked him if he wanted to be tased again and Mr. Reed responded "no."

The deputies asked him whether he would follow directions and whether he would commit to not

causing any more problems and Mr. Reed stated that there would be "no more fighting" and

"yes" he would follow all directions given to him. Mr. Reed then calmly walked with the

deputies out of his cell.

Later that evening, Deputies Christopher Dishong and Matthew Carter took Mr. Reed to

the Mount Carmel West Hospital Emergency Room for further examination and of the cut he

sustained on his head from his seizure. (Christopher Dishong Dep. at 41; Doc. No. 164-1.)

Deputy Dishong testified that they were placed in a section of the general emergency room area,

open to the general public, so that Mr. Reed could be seen by a nurse practitioner. Deputy

Dishong removed Mr. Reed's handcuffs and attached them to the bottom of the hospital

6

stretcher. He then attached leg irons to Mr. Reed's legs, and to the handcuffs. This gave Mr. Reed free movement of his arms and about five feet of slack between the leg irons and the handcuffs so that he could walk around the room.

Mr. Reed received stitches in the cut on his head and they were waiting for the discharge paperwork. Deputy Carter left the room to go to the restroom. As soon as the door closed behind Deputy Carter, Mr. Reed began to mutter under his breath and he put his feet under him on the bed, squatting. Deputy Dishong ordered him to lay back down. Mr. Reed responded by stating, "Do you want a piece of me?" (Dishong Dep. at 48.) Deputy Dishong informed Mr. Reed that if he did not lay back down he would be forced to tase him and showed him his Taser. Mr. Reed then lunged at Deputy Dishong with his hands raised and fists clinched. *Id.* Deputy Dishong tased Mr. Reed. ("Hospital Incident"). Mr. Reed fell off of the bed hitting the wall and the floor with his head. *Id.*

Mr. Reed has alleged claims of excessive force in violation of the Fourteenth Amendment or the Eighth Amendment to the United States Constitution against the deputies in their individual and official capacities. (Third Am. Compl. ¶¶ 201, 204.) He has also stated claims against Franklin County, the Franklin County Sheriff, the commanders of the facilities, and members of the Internal Affairs Bureau involved in reviewing the uses of force against him. Mr. Reed claims these individuals are liable for his injuries by failing to train deputies on the proper use of force and creating a policy and practice of excessive and abusive use of Tasers by employees of the Franklin County Sheriff's Department. *Id.* ¶ 210

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as

7

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

### III. ANALYSIS

Mr. Reed brings his claims pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under Section 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

#### A. Individual Capacity Claims

Mr. Reed contends that the defendants violated his constitutional right to be free from the use of excessive force when they tased him during the Cell Incident and the Hospital Incident.

The defendants argue that in their individual capacity they are qualifiedly immune from Mr. Reed's claims. This Court agrees.

Section 1983 claims are subject to the affirmative defense of qualified immunity which, if applicable, shields individuals against liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects state officials so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. The accommodation for reasonable error exists because officials should not always err on the side of caution due to the fear of being sued. *Id.*

Analysis of qualified immunity entails two steps: (1) considering the allegations in the light most favorable to the party injured, whether a constitutional right has been violated; and (2) whether that right was clearly established. *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2009). The order of this inquiry is not mandatory, nor does a court need to reach both steps of the analysis. *Pearson*, 555 U.S. at 236. It is the plaintiff's burden to show defendants are not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2009).

Mr. Reed asserts that the individual defendants violated his constitutional right to be free from the use of excessive force. The constitutional protections to which an individual is entitled in an excessive force claim "depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (quoting *Gravely v. Madden*, 142 F.3d 345, 348-49 (6th Cir. 1998)). Free

9

citizens may bring excessive force claims under the Fourth Amendment, wherein a court must utilize a reasonableness standard. *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). Pretrial detainees awaiting sentencing are protected from excessive force under the Fourteenth Amendment's Due Process clause, which protects a pretrial detainee from excessive force that amounts to punishment. *Id.* (citing *Graham*, 490 U.S. at 395 n.10; *United States v. Budd*, 496 F.3d 517, 530 (6th Cir. 2007)). Finally, convicted prisoners may bring excessive force claims under the Eight Amendment when it is alleged that "the particular use of force amounts to the 'unnecessary and wanton infliction of pain.'" *Graham*, 490 U.S. at 399, n.11 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–321 (1986)).

As the parties correctly point out, Mr. Reed does not fit squarely into any of these categories, being an individual who was in jail at the time of the incident but had been adjudicated NGRI. However, the Sixth Circuit has directed that, "when a plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials." *Lanman v. Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008) (citing *Phelps*, 286 F.3d at 300). Other courts have also specifically held that § 1983 claims by persons who have been found NGRI and confined in state institutions are properly analyzed under the Fourteenth Amendment. *See Andres v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001) (stating that the Fourteenth Amendment is applicable to excessive force claims by individuals found NGRI as the state is not allowed to punish them but

is able to confine them); *Escobar v. Obiakor*, No. EDCV 06-693-GW(CW), 2010 WL 6714066

at *3 (C.D. Ca. Sept. 29, 2010) (same); *Atterbury v. Vandiver*, No. CIV S-05-1365 DAD P, 2009

WL 902388 at *8 (E.D. Ca. March 31, 2009) (same). Thus, the Court, like the parties, utilizes a

Fourteenth Amendment analysis.

"The [Fourteenth Amendment] due process guarantee does not entail a body of

constitutional law imposing liability whenever someone cloaked with state authority causes

harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (quoting *County of*

*Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). The plaintiff "must demonstrate that the state

acted with the requisite culpability to establish a substantive due process violation under the

Fourteenth Amendment." *Id.* "As the Supreme Court has explained, this requires that the § 1983

plaintiff show that the challenged action was so 'egregious' that it can be said to be 'arbitrary in

the constitutional sense.'" *Id.* (quoting *Lewis*, 523 U.S. at 846). To make a showing of excessive

force under the Fourteenth Amendment, the Sixth Circuit has instructed:

> A substantially higher hurdle must be surpassed to make a showing of excessive
> force under the Fourteenth Amendment than under the "objective reasonableness"
> test [under the Fourth Amendment as articulated in] *Graham*, in which excessive
> force can be found if the officer's actions, in light of the totality of the circumstances,
> were not objectively reasonable. *Graham*, 490 U.S. at 396-97; *Lewis*, 523 U.S. at
> 845-46. The substantive due process rights of the Fourteenth Amendment protect
> citizens from the arbitrary exercise of governmental power. *Lewis*, 523 U.S. at 845.
> The test applied by the Supreme Court to determine when governmental conduct
> reaches this threshold is to ask whether the alleged conduct "shocks the conscience."
> *Id.* at 846. In *Lewis*, the Supreme Court explained that whether governmental
> conduct shocks the conscience depends on the factual circumstances of the case. *Id.*
> at 851-53. More specifically, in situations where the implicated government actors
>
> > are afforded a reasonable opportunity to deliberate various
> > alternatives prior to electing a course of action . . ., their actions will
> > be deemed conscience-shocking if they were taken with "deliberate
> > indifference" towards the plaintiff's federally protected rights. In

is able to confine them); *Escobar v. Obiakor*, No. EDCV 06-693-GW(CW), 2010 WL 6714066 at *3 (C.D. Ca. Sept. 29, 2010) (same); *Atterbury v. Vandiver*, No. CIV S-05-1365 DAD P, 2009 WL 902388 at *8 (E.D. Ca. March 31, 2009) (same). Thus, the Court, like the parties, utilizes a Fourteenth Amendment analysis.

"The [Fourteenth Amendment] due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). The plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Id.* "As the Supreme Court has explained, this requires that the § 1983 plaintiff show that the challenged action was so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Id.* (quoting *Lewis*, 523 U.S. at 846). To make a showing of excessive force under the Fourteenth Amendment, the Sixth Circuit has instructed:

> A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the "objective reasonableness" test [under the Fourth Amendment as articulated in] *Graham*, in which excessive force can be found if the officer's actions, in light of the totality of the circumstances, were not objectively reasonable. *Graham*, 490 U.S. at 396-97; *Lewis*, 523 U.S. at 845-46. The substantive due process rights of the Fourteenth Amendment protect citizens from the arbitrary exercise of governmental power. *Lewis*, 523 U.S. at 845. The test applied by the Supreme Court to determine when governmental conduct reaches this threshold is to ask whether the alleged conduct "shocks the conscience." *Id.* at 846. In *Lewis*, the Supreme Court explained that whether governmental conduct shocks the conscience depends on the factual circumstances of the case. *Id.* at 851-53. More specifically, in situations where the implicated government actors
>
> > are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action . . ., their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. In

11

contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . ., public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (quoting *Lewis*, 523 U.S. at 852-53).

*Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001).

In the case *sub judice*, the officers involved in both the Cell Incident and the Hospital Incident were not afforded the luxury of calm and reflective pre-response deliberation, and instead were involved in more quickly evolving, fluid, and potentially dangerous situations. Thus, the defendant officers' conduct violates Mr. Reed's constitutional rights only if they tased him maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore a safe environment.

Reviewing all of the evidence, including the Internal Affairs Reports and their accompanying video, and all depositions concerning these incidents, the Court concludes that no rational fact finder could conclude that the defendant deputies acted with conscience-shocking malice or sadism towards Mr. Reed during either the Cell Incident or the Hospital Incident.

### 1. Cell Incident

The defendant deputies arrived at the cell in response to a code blue medical alert. Before entering the cell, Corporal Byrd was advised by a mental health liaison at the jail that Mr. Reed recently had a seizure and that previously, upon coming out of a seizure, he had assaulted an emergency responder. Given this history, Corporal Byrd decided that it was not safe for medical personnel to meet with Mr. Reed until he was controlled. This decision was not unreasonable,

malicious, or sadistic.

Mr. Reed allowed the deputies to cuff his left wrist, but would not let them cuff his right wrist. The deputies made several attempts to force Mr. Reed to comply by grabbing at his hand and/or arm. Mr. Reed continued to resist. The Deputies warned Mr. Reed numerous times that he would be tased if he did not comply. Ultimately, Corporal Byrd chose to gain control of Mr. Reed through the use of a Taser as opposed to continuing the hand-to-hand grappling, which the deputes perceived as dangerous. Indeed, two experts both opined that it was unsafe to approach Mr. Reed because of the loose handcuff. (Doc. No. 163-4 (Meyer Report at 17) (stating that inmate Reed was unsafe to approach because of the loose handcuff); (Doc. No. 163-19) (Quinn Report at 9) (opining that the loose handcuff was a threat and could cause injury to officers and Mr. Reed). As Deputy Kern explained in his deposition:

> I don't know how familiar you are with handcuffs; but when they're open, it's a very sharp, rigid, jagged edge. There are several reports of people being killed, throats slit, eyes hooked. It's a dangerous weapon to lose control of. It's stressed during every training through the State or the County that you never want to lose control of your handcuffs with an inmate or give the inmate control of a handcuff.

Dep. Kern, p. 42, l. 2-10. The deputies had lost control of the handcuffs. Even still, they made numerous attempts to gain control of Mr. Reed before they employed the Taser. Mr. Reed contends that he was unresponsive to the orders given him because he had suffered a seizure and that he was tased after he had been "disabled or neutralized."

Mr. Reed was certainly more than non-responsive – he was actively resisting placing his uncuffed hand behind his back to permit the complete cuffing. The video evidence unequivocally shows that Mr. Reed was struggling against the defendant deputies, holding his hands clenched together in front of him and using his whole body to resist the deputies' efforts to

13

pull his hands behind his back. This Court has held, and the Sixth Circuit affirmed, that using a Taser to restrain an individual who resisted being handcuffed did not shock the conscience. *Francis v. Pike County*, 708 F. Supp. 170 (S.D. Ohio 1988), *aff'd* 875 F.2d 863 (6th Cir. 1989). This Court and sister district courts have also found that tasing an individual who actively resists being handcuffed surpasses the substantially lower standard a plaintiff must meet under the Fourth Amendment. *See Edwards v. City of Martins Ferry*, 554 F. Supp. 2d 797 (S.D. Ohio 2008) (82 year old suffering from Alzheimer's Disease was tased after resisting being handcuffed during an arrest for urinating in park); *Turner v. City of Toledo*, 2012 U.S. Dist. LEXIS 66908 (N.D. Ohio 2012) ("But even viewing the facts in the light most favorable to Plaintiff, it is undisputed that 'Mr. Turner attempted to pull his arms free from the grasp of the officers,' resulting in a 'physical struggle,' albeit one that was 'very brief [and] minor . . . .' [making] Lewis' use of the taser [] reasonable under *Graham*"). Like the plaintiffs in these cases, Mr. Reed also actively refused to put his hands behind him and struggled with the deputies to avoid being cuffed.

Mr. Reed suggests that he was handcuffed during the second tasing. The video evidence belies this suggestion. However, even if he were handcuffed, this Court and our sister district courts have even found tasing reasonable when the individual is handcuffed but still struggling or resisting an officer's commands. *See Turner*, 2012 U.S. Dist. LEXIS 66908, at *33–34 (N.D. Ohio 2012) (reasonable to tase handcuffed suspect who continued to resist by rolling from side-to-side and kicking); *Johnson v. City of Lincoln Park*, 434 F. Supp. 2d 467, 479-80 (E.D. Mich. 2006) (reasonable to tase already-handcuffed suspect where suspect ignored warnings, thrashed around, bit, and attempted to head but officer); *Goebel v. Taser Int'l*, No. 5:07 CV 0027, 2007

14

U.S. Dist. LEXIS 68560, at *19-*21 (N.D. Ohio 2007) (two tasings on already handcuffed suspect reasonable where suspect posed threat to officers by fighting, kicking, and rolling side-to-side) *DeVoe v. Rebant*, Case No. 05-71863, 2006 U.S. Dist LEXIS 5326, at *5, *17–25 (E.D. Mich. Feb. 13, 2006) (tasing reasonable where handcuffed suspect resisted officer's attempt to physically move suspect into patrol car).

Finally, the Court notes that Mr. Reed's argument that he was unresponsive because he had suffered a seizure and did not understand what was going on is not borne out by the video evidence. That is, once handcuffed, Mr. Reed responded appropriately when asked if he wanted to be tased again and whether he would follow directions and commit to not causing any more problems. Mr. Reed responded "no" he did not want to be tased, "yes" he would follow all directions given to him and stated that there would be "no more fighting." Mr. Reed then calmly walked with the deputies out of his cell. This behavior is not indicative of an individual who did not understand what was happening.

When viewing the evidence in the light most favorable to Mr. Reed and drawing all reasonable inferences in his favor, the Court concludes that Mr. Reed has failed to raise any issue of material fact that Corporal Byrd tased him for any reason other than a good faith effort to restore a safe environment.

### 2. Hospital Incident

As to the Hospital Incident, Deputy Dishong stated in his deposition and in his statement in Internal Affairs Report 09-049 that he tased Mr. Reed after Reed verbally threatened him, stood on the hospital bed, and lunged toward him with clenched fists. Deputy Dishong was not able to retreat from this attack because of a nurse's station directly behind him. Mr. Reed claims

15

that this testimony is "simply not true." (Doc. No. 168 at 15.) He contends that "[i]t is evident

form the 'Attending Note' from the hospital records that Mr. Reed was standing up on the

stretcher 'talking loudly and not making sense' and that he was 'shackled to the bed by the ankle

at the time' the deputy tased him" *Id.* No party disputes that Mr. Reed was shackled to the bed.

What is significant, however, is that he was not restrained from moving about the hospital room

for a distance of up to five feet from the bed.

Initially, the Court notes that Mr. Reed does not indicate where the "Attending Note" can

be found in the record, nor can this Court find it. Thus, it is of no evidentiary value. However,

even if there is a Note that states what Mr. Reed says it states, that does nothing to cast doubt on

Deputy Dishong's testimony, which is uncontroverted. That is, the Attending Note and Deputy

Dishong's testimony are not incongruous.

Mr. Reed relies upon *McCline v. Roose*, No. 1:07 CV 0545, 2009 WL 585844 (N.D. Ohio

March 6, 2009) for the proposition "that 'the gratuitous use of force on a suspect who has already

been subdued and placed in handcuffs is unconstitutional.'" (Doc. No. 168 at 10.) However,

unlike the defendant in *McCline*, who was subdued, Mr. Reed certainly was not subdued.

Deputy Dishong has averred, and Mr. Reed has not denied, that Reed was attempting to assault

Dishong and had approximately five feet of slack in the cuffs, permitting him to move toward the

deputy.

The Court finds that even when accepting Mr. Reed's evidence as true and drawing all

justifiable inferences in his favor, he has failed to raise any genuine issue of material fact on the

issue of whether that Deputy Dishong maliciously and sadistically tased Mr. Reed for the very

purpose of causing harm as opposed to making a good faith effort to restore a safe environment.

16

### 3. Conclusion Qualified Immunity

Because Mr. Reed has failed to raise any genuine issue of material fact as to whether his constitutional right to be free from excessive force was violated during either the Cell Incident or the Hospital Incident, the individual defendants are entitled to qualified immunity without the need for the Court to determine if the alleged constitutional right was clearly established. *See Pearson*, 555 U.S. at 236.  The Court, therefore, **GRANTS** the defendants' motion for summary judgment on these claims.

### B. Official Capacity and Franklin County

Mr. Reed also brings claims against the individual defendants in their official capacity and against Franklin County.  "As previously indicated, the doctrine of qualified immunity safeguards only certain natural person defendants in their individual capacities." *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000) (citation omitted).  "By contrast, if the legal requirements of municipal or county civil rights liability are satisfied,[2] qualified immunity will

---

[2]The *Clay County* Court explained in its footnote:

Municipalities and counties are "persons" exposed to litigation under sections 1983 and 1988, if the legal requisites are fulfilled. *Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997). *See, e.g., Haverstick Enterprises v. Financial Federal Credit*, 32 F.3d 989, 996 n. 8 (6th Cir. 1994) ("section 1983 actions against municipalities [or counties] carry certain special elements, including proof (1) that the City [or county] pursued an official custom or policy of failing to adequately train, supervise, or discipline its officers in a particular matter, and (2) that such official policy or custom was adopted by the official makers of policy with 'deliberate indifference' towards the constitutional rights of persons affected by the policy or custom.") (brackets added) (citing *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989)). *See also Collins v. City of Harker Heights*, 503 U.S. 115, 120-24 (1992); *Monell v. Department of Social Services*, 436 U.S. 658, 690-95 (1978).

*Clay County*, 250 F.3d at 879 n.21 (parallel citations omitted) (alterations in original); *see also Monell*, 436 U.S. at 692-94 (section 1983 does not permit a plaintiff to sue a local government

17

not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, if those agents in fact had invaded the plaintiff's constitutional rights." *Id.* (citing *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163, 166-67 (1993); *Garner v. Memphis Police Dept.*, 8 F.3d 358, 365 (6th Cir. 1993)). "'An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents.'" *Id.* (citing *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000)).

Consequently, Mr. Reed's claims against the individual defendants in their official capacity and against Franklin County cannot survive by virtue of the Court's finding that Mr. Reed did not suffer infringement of his constitutional rights. Accordingly, the Court **GRANTS** the defendants motion for summary judgment on these claims.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** the defendants' motion for summary judgment. (Doc. No. 163.) The claims of Dawn Fiore-Bruno, Nicole Bradley, Frankie Mosely and Dawn Powell remain pending.

**IT IS SO ORDERED.**

<table>
<tr><td>1 - 2 - 2013<br>**DATE**</td><td>**EDMUND A. SARGUS, JR.**<br>**UNITED STATES DISTRICT JUDGE**</td></tr>
</table>

---

entity on the theory of *respondeat superior* and permits a finding of liability only for the entity's own wrongdoing).

18